| | |
|---|---|
| **NELSON ARCE ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **No. 16-14003** |
| **LOUISIANA STATE ET AL.** | **SECTION I** |

## <u>AMENDED ORDER AND REASONS</u>[1]

When Nelson and Lazaro Arce decided to challenge the Louisiana criminal justice system's treatment of the deaf, the Court doubts that they anticipated having to navigate through two of the murkiest waters in American law: federalism and separation of powers. Yet this case raises weighty questions about the federal government's authority to endow private citizens with the power to haul a State into federal court without its consent, and about the powers of executive branch agencies to authoritatively interpret federal statutes—and thus requires nothing less than a deep plunge into both pools.

The State of Louisiana, through the Department of Public Safety and Corrections ("Louisiana"), moves for dismissal of Lazaro Arce's claims against it on the ground that neither Title II of the Americans with Disabilities Act ("Title II") nor § 504 of the Rehabilitation Act of 1973 ("§ 504") provides a cause of action based on associational discrimination.[2] Louisiana also requests dismissal of plaintiffs' Title II claim on behalf of Nelson as barred by sovereign immunity—a request that the Court

---

[1] This Amended Order and Reasons corrects a typographical error in the original Order and Reasons.

[2] R. Doc. No. 76.

construes as a motion to dismiss for lack of subject matter jurisdiction.[3] *See Cantu Serv., Inc. v. Roberie*, 535 Fed. App'x 342, 346 n.3 (5th Cir. 2013). Plaintiffs oppose both moves.[4]

After considering the parties' submissions and the applicable law, the Court concludes that Lazaro's claims against Louisiana warrant dismissal and that plaintiffs' Title II claim on behalf of Nelson may proceed.

## I.

According to plaintiffs, Nelson Arce ("Nelson") was a deaf individual whose "express, preferred, and most effective means of communication" was American Sign Language ("ASL").[5] Nelson's proficiency in written English was allegedly "limited."[6] Lazaro Arce ("Lazaro") is Nelson's father.[7]

On February 9, 2015, Judge Michael Mentz of the Twenty Fourth Judicial District Court in Jefferson Parish[8] sentenced Nelson to two years of active probation and two years of inactive probation for a drug-related offense.[9] As a condition of his probation, Judge Mentz ordered Nelson to enter and complete a Louisiana-approved in-house substance abuse treatment program, and required Nelson to meet regularly with his probation officer.[10]

---

[3] R. Doc. No. 85.
[4] R. Doc. No. 78; R. Doc. No. 86.
[5] R. Doc. No. 69, ¶ 1.
[6] *Id.* ¶ 20.
[7] *Id.* ¶ 1.
[8] The Court takes judicial notice of the court on which Judge Mentz sits. *See* Division F, The Twenty Fourth Judicial District Court, http://www.24jdc.us/judges/division-f/ (last visited Oct. 23, 2017).
[9] R. Doc. No. 69, ¶¶ 1, 27.
[10] *Id.* ¶¶ 27-28.

Plaintiffs allege that Nelson's probation officer was aware that Nelson required a sign language interpreter to effectively communicate, but never provided an ASL interpreter during her meetings with Nelson.[11]  Despite Nelson and Lazaro's alleged "repeated requests" for a qualified interpreter—one who could translate legal terminology and concepts[12]—the probation officer relied on Lazaro to interpret for Nelson.[13]

Because his probation officer did not provide a qualified interpreter at their meetings, Nelson was allegedly unaware of the full terms and conditions of his probation.  Thus, he did not know that "leaving [Louisiana] to attend drug treatment as ordered by [Judge Mentz] was a violation of his probation."[14]

When Nelson's probation officer learned that Nelson had enrolled in a California-based in-patient drug treatment program, she filed a motion to revoke Nelson's probation.[15]  Judge Mentz granted the motion and sentenced Nelson to 90 days in the Jefferson Parish Correction Center ("JPCC").[16]  Nelson was then incarcerated at JPCC from December 8, 2015, until March 7, 2016, during which time JPCC inmates were allegedly entitled to two thirty-minute telephone conversations per day.[17]  JPCC did not have video phones, but did have a teletypewriter ("TTY"),[18] which is a device that enables deaf individuals to communicate by telephone.[19]

---

[11] *Id.* ¶¶ 30, 50.
[12] *See id.* ¶ 57.
[13] *Id.* ¶ 34.
[14] *Id.* ¶ 38.
[15] *Id.* ¶¶ 35-38.
[16] *Id.* ¶ 39.
[17] *Id.* ¶¶ 40-41.
[18] *Id.* ¶¶ 41-42.
[19] R. Doc. No. 42, at 3.

According to plaintiffs, JPCC officials either denied Nelson access to the TTY machine or provided him access only once per day on a number of occasions.[20] All the while, other JPCC inmates regularly received two thirty-minute telephone conversations per day.[21]

Further, JPCC officials allegedly penalized Nelson twice during his incarceration for violating the rules contained in "The Inmate Handbook" ("Handbook"), which details the behavioral expectations for inmates incarcerated at JPCC.[22] Despite an alleged request by Lazaro that a qualified interpreter communicate the Handbook's contents to Nelson in ASL, Nelson never received an ASL interpretation of the Handbook and thus did not understand the Handbook's rules and regulations.[23] Plaintiffs allege that Nelson never learned which rule he violated on one of the occasions that he was punished.[24]

Nelson was released from JPCC on March 7, 2016, and resumed meeting with his probation officer.[25] Nelson's probation officer continued to attempt to communicate with Nelson either through Lazaro's interpretations or written English.[26] The probation officer allegedly suggested that it was Nelson's responsibility to secure a qualified interpreter for their meetings if he wanted one.[27]

---

[20] R. Doc. No. 69, ¶¶ 42-43.
[21] *Id.*
[22] *Id.* ¶¶ 44-45.
[23] *Id.* ¶¶ 45, 47.
[24] *Id.* ¶ 46.
[25] *Id.* ¶¶ 48-49.
[26] *See id.* ¶¶ 52, 57.
[27] *Id.* ¶ 52.

In response to these events, Nelson and Lazaro brought this lawsuit against numerous defendants, including Louisiana, alleging violations of Title II and § 504, and seeking both injunctive relief and money damages. Since Nelson and Lazaro's initiation of the case, the Court has dismissed the claims against Jefferson Parish,[28] as well as the claims for injunctive relief.[29] Moreover, in light of Nelson's death on May 9, 2017,[30] the Court permitted Ana Christine Shelton ("Shelton") to be substituted in Nelson's place in her capacity as the natural tutrix of Nelson's two surviving minor children and as the administratrix of Nelson's estate.[31]

## II.

### A.

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for the dismissal of an action where the court lacks subject matter jurisdiction over the action. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998).

Any party may object to the court's subject matter jurisdiction "at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006). So too may the court raise the issue on its own initiative. *Id.* Indeed, the court has an "independent obligation" to ensure in every case that subject matter jurisdiction exists. *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). If

---

[28] R. Doc. No. 42.
[29] R. Doc. No. 80.
[30] R. Doc. No. 64.
[31] R. Doc. No. 68.

the court determines that subject matter jurisdiction over an action is lacking, then the court must dismiss the action. *Arbaugh*, 546 U.S. at 514; *see also* Fed. R. Civ. P. 12(h)(3).

A court may dismiss an action for lack of subject matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). Once the defendant has questioned the court's subject matter jurisdiction, the plaintiff bears the burden of "proving by a preponderance of the evidence that the trial court does" possess the requisite jurisdiction to hear the case. *Patterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

Where "a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). After all, "[f]or a court to pronounce upon [the merits] when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998).

## B.

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings once the pleadings are closed, as long as the party moves "early enough not to delay trial." "A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Doe*

*v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *see also Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007) (applying Rule 12(b)(6) case law in the Rule 12(c) context).

Thus, Rule 12(c)—like Rule 12(b)(6)—permits a court to dismiss a complaint, or any part of it, where a plaintiff has not set forth well-pleaded factual allegations that would entitle him to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). A plaintiff's factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In other words, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570)).

A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* If the well-pleaded factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then "the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

In evaluating a Rule 12(c) motion, a court—as in the Rule 12(b)(6) context—limits its review "to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). In assessing the complaint, the Court must accept all well-pleaded factual allegations as true and liberally construe all such allegations

in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). Where "the complaint 'on its face show[s] a bar to relief,'" then dismissal is the appropriate course. *Cutrer v. McMillan*, 308 Fed. App'x. 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)).

## III.

Louisiana moves for dismissal of plaintiffs' Title II claims on the basis of sovereign immunity.[32] Moreover, Louisiana moves for judgment on the pleadings as to all of Lazaro's claims.[33]

Resolution of the sovereign immunity question will involve addressing the viability of Lazaro's Title II claims. The Court therefore will structure its analysis around the issue of sovereign immunity.

## A.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Despite the Eleventh Amendment's language targeting discrete categories of Article III diversity jurisdiction, the Supreme Court has fashioned a doctrine of Eleventh Amendment sovereign immunity defined by reference to "the Constitution's structure, its history, and the authoritative interpretations by this Court." *Alden v. Maine*, 527 U.S. 706, 713 (1999); *see also*

---

[32] R. Doc. No. 85.
[33] R. Doc. No. 76.

*Hans v. Louisiana*, 134 U.S. 1, 13 (1890); *cf. Meyers ex rel. Benzing v. Tex.*, 410 F.3d 236, 240-41 (5th Cir. 2005) ("'Eleventh Amendment immunity' is a misnomer, . . . because that immunity is really an aspect of the Supreme Court's concept of state sovereign immunity and is neither derived from nor limited by the Eleventh Amendment.").

Sovereign immunity operates as "a constitutional limitation on the federal judicial power." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). However, unlike other aspects of the federal courts' subject matter jurisdiction, sovereign immunity is waivable: "a State may consent to suit against it in federal court."[34] *Id.* at 99.

In addition, Congress may abrogate State sovereign immunity when exercising at least some of its constitutional powers. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) (holding that Congress has the power to abrogate State sovereign immunity under § 5 of the Fourteenth Amendment); *but see Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 72 (1996) (holding that Congress does not have the power to abrogate State sovereign immunity under the Indian Commerce Clause). Abrogation requires "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" *Pennhurst*, 465 U.S. at 99. "A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985), *superseded by* An Act to Extend and Improve

---

[34] As a general matter, Louisiana has not waived its sovereign immunity from suit in federal court. *See* La. R.S. § 13:5106(A).

the Rehabilitation Act of 1973, Pub. L. 99-506, 100 Stat. 1807 (1986). If Congress wants to subject the several States to federal jurisdiction, then "it must do so specifically."[35] *Id.*

## B.

The ADA is "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).

Importantly for present purposes, Congress "invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment . . ., in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). To that end, the ADA declares that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation" of the ADA. *Id.* § 12202. In 2001, the Fifth Circuit held that this

---

[35] Besides waiver and abrogation, the Supreme Court has also recognized that an individual may bring certain kinds of federal claims directly against State officers in their individual capacities and avoid the sovereign immunity bar. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908); *see also Edelman*, 415 U.S. at 676 (limiting *Ex parte Young* actions to claims seeking prospective injunctive relief); *Seminole Tribe*, 517 U.S. at 75-76 (concluding *Ex parte Young* actions are not available where Congress has established a remedial scheme to settle a particular claim, even if that scheme is inoperable). In this case, Louisiana itself is a party. Unless Congress has validly abrogated Louisiana's sovereign immunity or Louisiana has unambiguously waived its sovereign immunity with respect to Title II claims, plaintiff cannot assert such claims against Louisiana in this Court. *See Pennhurst*, 465 U.S. at 98.

provision—although expressing Congress's clear intent to abrogate State sovereign immunity—did not validly do so with respect to Title II. *Reickenbacker v. Foster*, 274 F.3d 974, 975 (5th Cir. 2001), *abrogated by Tennessee v. Lane*, 546 U.S. 151 (2004).

That holding, however, was itself abrogated by the Supreme Court. *See United States v. Georgia*, 546 U.S. 151 (2006); *Lane*, 541 U.S. at 533-34. In other words, Congress *did* validly abrogate State sovereign immunity under Title II—at least in *some* cases:

> In *United States v. Georgia*, the Supreme Court established a three-part test for addressing whether Title II validly abrogates [S]tate sovereign immunity in a given case. A court should consider "which aspects of the State's alleged conduct violated Title II" and then determine "to what extent such misconduct also violated the Fourteenth Amendment." If the State's conduct violated both Title II and the Fourteenth Amendment, Title II validly abrogates state sovereign immunity. If the State's conduct violated Title II but did not violate the Fourteenth Amendment, the court must then determine "whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."

*Hale v. King*, 642 F.3d 492, 497-98 (5th Cir. 2011) (quoting *Georgia*, 546 U.S. at 159).

Thus, a court first subjects a plaintiff's allegations to the familiar Rule 12(b)(6) standard. *Id.* at 498. Where the allegations state a claim under Title II, but not under the Fourteenth Amendment, a court must then consider whether Congress's abrogation of State sovereign immunity in a particular case exhibits "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."[36] *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997); *see also Wells v. Thaler*, 460 Fed. App'x 303, 311 (5th Cir. 2012) (per curiam).

---

[36] "Congress' power 'to enforce' the [Fourteenth] Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by

# IV.

The Court will first consider "which aspects of the State's alleged conduct violated Title II."[37] *Hale*, 642 F.3d at 498 (quoting *Georgia*, 546 U.S. at 159) (internal quotation marks omitted). As a general matter, a viable Title II requires a plaintiff to allege "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Id.* at 499; *see also* 42 U.S.C. § 12132.

As far as which aspects of Louisiana's alleged conduct toward *Nelson* violated Title II for purposes of the *Georgia* analysis, the parties are in unison: the decision by Nelson's probation officer not to procure the services of a qualified ASL interpreter for her meetings with Nelson.[38] When it comes to which aspects of Louisiana's alleged

---

the Amendment's text." *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000)). "In other words, Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727-28 (2003).

[37] In *Hale v. King*, 642 F.3d 492 (5th Cir. 2011), the Fifth Circuit observed that "[i]t is unclear whether, under *Georgia*, a court is required to determine if allegations state a claim for relief under Title II before proceeding to consider any other issue in the three-part analysis." 642 F.3d at 498. The *Hale* Court then expressly declined to decide "whether *Georgia prohibits* a court from addressing the validity of Title II's abrogation of state sovereign immunity without first deciding that a claimant's allegations actually state a claim for relief under Title II." *Id.*

For its part, the Court will follow the safest path and proceed through the steps of the relevant analysis in the order outlined in *Georgia*.

[38] *See* R. Doc. No. 85, at 3; R. Doc. No. 86, at 6. As the parties only identify this particular conduct by Louisiana as violative of Nelson's Title II rights, the Court considers any argument that other conduct by Louisiana toward Nelson violated Title II to be waived. *Cf. Al-Ra'id v. Ingle*, 69 F.3d 28, 33 (5th Cir. 1995) (concluding that the appellant "has effectively abandoned his claim by failing to brief it").

conduct toward *Lazaro* violated Title II, however, the parties could not be farther apart.

Lazaro—who is not deaf or otherwise alleged to have a "qualifying disability"—offers a theory of Title II (and § 504) liability based on the concept of associational discrimination. In a nutshell, Lazaro alleges that Louisiana discriminated against him on the basis of his *association* with Nelson and *because of* Nelson's "qualifying disability."[39]

For its part, Louisiana argues that Title II (and § 504) does not permit associational discrimination claims, relying almost exclusively on a recent opinion out of the Northern District of Georgia.[40] Acknowledging that a regulation promulgated by the Attorney General to implement Title II recognizes such claims,[41] *see* 28 C.F.R. § 35.130(g), Louisiana contends that the regulation is unlawful.[42] Finally, in the alternative, Louisiana argues that Lazaro has failed to state a claim of associational discrimination against Louisiana under Title II (or § 504).[43]

Where, as here, an executive agency's regulation interpreting a federal statute is called into question, the Supreme Court has instructed courts to analyze the interpretation's permissibility through the lens of what may amount to administrative law's most consequential—and controversial[44]—doctrine: *Chevron*.

---

[39] *See* R. Doc. No. 78, at 9-11.

[40] *See* R. Doc. No. 76-1, at 3-6 (discussing *Todd v. Carstarphen*, 236 F. Supp. 3d 1311 (N.D. Ga. 2017)).

[41] Congress delegated the responsibility to promulgate regulations implementing Title II to the Attorney General. *See* 42 U.S.C. § 12134(a).

[42] *See* R. Doc. No. 76-1, at 6.

[43] *See id.* at 7.

[44] *See, e.g.*, *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149-58 (10th Cir. 2016) (Gorsuch, J., concurring) ("[T]he fact is *Chevron* and *Brand X* permit executive

## A.

Under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), a court confronts two questions when reviewing an agency's regulation implementing a statute that it administers.[45]  467 U.S. at 842.  "First, always, is the question whether Congress has directly spoken to the precise question at issue." *Id.* "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.

To discern congressional intent, courts often rely "solely on the language of the statute." *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 351 (5th Cir. 2017).  Indeed,

---

bureaucracies to swallow huge amounts of core judicial and legislative power and concentrate federal power in a way that seems more than a little difficult to square with the Constitution of the framers' design."); Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2151 (2016) ("We must recognize how much *Chevron* invites an extremely aggressive executive branch philosophy of pushing the legal envelope (a philosophy that, I should note, seems present in the administrations of both political parties).").

[45] "[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead*, 533 U.S. 218, 226-27 (2001).  "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Id.* at 227.  Further, "[w]here the agency has not used a deliberative process such as notice-and-comment rulemaking, or where the process by which the agency reached its interpretation is unclear, the court cannot presume Congress intended to grant the interpretation the force of law." *Freeman v. Quicken Loans, Inc.*, 626 F.3d 799, 805 (5th Cir. 2010).

 In this case, the parties do not dispute that the Attorney General possesses authority to issue regulations carrying the force of law and that the Title II regulation at issue represents an exercise of that authority via notice-and-comment rulemaking. *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35694, 35694-95 (July 26, 1991) (explaining the relevant rulemaking history).

"plain statutory language is the most instructive and reliable indicator of Congressional intent." *Martinez v. Mukasey*, 519 F.3d 532, 543 (5th Cir. 2008); *see also Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 283 (1996) (Scalia, J., concurring in part and concurring in the judgment) ("The text's the thing."). Thus, "[i]f the statute's language is unambiguous," then the "plain language" controls "absent some resulting absurdity." *Id.* at 345. Courts do not examine text outside of context, however; a statute is read "as a whole," and an interpreter must remain "mindful of the linguistic choices made by Congress." *Whatley v. Resolution Trust Co.*, 32 F.3d 905, 909 (5th Cir. 1994).

Where a court concludes that "Congress has not directly addressed the precise question at issue," then it "does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." *Chevron*, 467 U.S. at 843. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.

## B.

The Title II regulation challenged by Louisiana states: "A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35:130(g).

Whether this regulation is consistent with Title II is the question to which the Court will now turn.

## i.

The Court will begin, as it must, with the statutory text. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II defines a "qualified individual with a disability" as "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, [among other things,] meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2).

In other words, Title II's nondiscrimination provision protects a specific and discrete class of individuals against discrimination by public entities: those *with a disability*. Discrimination against a *nondisabled* individual by a public entity due to his association with a *disabled* individual does not run afoul of the provision's plain language. *See A Helping Hand, LLC v. Baltimore Cty., Md.*, 515 F.3d 356, 363 (4th Cir. 2008) (recognizing that "Title II contains no express right to be free from discrimination because of association with qualified individuals with disabilities").

Title II further provides that its "remedies, procedures, and rights" are available to "any person alleging discrimination on the basis of disability in violation of" Title II's nondiscrimination provision. *Id.* § 12133. Of course, only discrimination by a public entity against a "qualified individual with a disability" may result in a

violation of said provision. *Id.* § 12132; *see Lightbourn v. Cty. of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997) (interpreting Title II's nondiscrimination provision to require Title II plaintiffs to demonstrate, among other things, "that they are qualified individuals within the meaning of" Title II). Thus, a nondisabled person—who is textually foreclosed from personally experiencing a form of discrimination that violates Title II's nondiscrimination provision—would seem equally foreclosed from pursuing Title II's "remedies, procedures, and rights."[46] 42 U.S.C. § 12133.

Notwithstanding, a number of circuits have interpreted Title II to permit at least some organizations (or their operators) that experience discrimination by public entities due to their association with "qualifying individual[s] with a disability" to seek redress under Title II. *See Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d. Cir. 1997) (concluding that a drug- and alcohol-rehabilitation treatment center has standing to sue under Title II), *recognized as superseded on other grounds, Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001); *Addiction Specialists, Inc. v. Township of Hampton*, 411 F.3d 399, 405-07 (3rd Cir. 2005) (same for the operator of a methadone clinic); *A Helping Hand*, 515 F.3d at 363 (same for the operator of a methadone clinic); *see also MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002) (adopting the relevant reasoning in

---

[46] Background principles of Article III standing inform the Court's understanding of the constitutional scope of Title II's enforcement provision. One component of constitutional standing is the "concrete injury requirement," which mandates that the injury sued upon be both "concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 578 (1992). "[T]he party seeking review [must] be himself among th[ose] injured" by a public entity's conduct. *Id.* at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)) (internal quotation marks omitted). Thus, the person "alleging discrimination" must have *experienced* discrimination. 42 U.S.C. § 12133.

*Innovative Health* as "persuasive" in the context of an entity seeking to open a methadone clinic). In reaching this conclusion, these courts—like plaintiffs[47]—hone in on the phrase "any person alleging discrimination on the basis of disability," with a particular emphasis on "any person." 42 U.S.C. § 12133; *see also* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals . . . .").

"Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). Notwithstanding a word's isolated meaning, however, one does not interpret a text with any degree of accuracy by limiting the interpretive enterprise to myopic examination of each of the text's individual constituent words. *See Roberts v. Sea-Land Serv., Inc.*, 566 U.S. 93, 101 (2012) ("Statutory language . . . cannot be construed in a vacuum." (internal quotation marks omitted)). Instead, one must heed the particular *combination* of words selected by the author, whether an individual or group of individuals. In short, context matters. *See Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007) (observing that "broad language is not limitless" and that "a liberal construction nonetheless can find limits in a text's language, context, history, and purposes"); *Food & Drug Admin. V. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words

---

of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotation marks omitted)).

With two eyes on context, the breadth of "any" as used in Title II seems as clear as crystal: "any" is explicitly limited to "person[s] alleging discrimination on the basis of disability *in violation of*" Title II's nondiscrimination provision." 42 U.S.C. § 12133 (emphasis added); *cf. Gonzales*, 520 U.S. at 5 (interpreting 18 U.S.C. § 924(c)(1), and distinguishing between a phrase that explicitly limits the breadth of the word "any" and a phrase that does not). Thus, the plain language of Title II seems to reserve the keys to the remedial kingdom for plaintiffs alleging *both* 1) "discrimination on the basis of disability" *and* 2) "discrimination . . . in violation of" Title II's nondiscrimination provision." 42 U.S.C. § 12133. While the former requirement is broad enough to encompass associational discrimination—which is based on disability—the latter requirement is not.

Looking beyond the four corners of Title II's text, some circuits have also considered Title II's legislative history as relevant to interpreting the statute's scope. *See, e.g.*, *Innovative Health*, 117 F.3d at 47; *A Helping Hand*, 515 F.3d at 364. This nontextual evidence suggests that at least some of the legislators involved in drafting Title II intended that Title II cover all forms of discrimination prohibited under Titles I and III of the ADA. *See, e.g.*, H.R. Rep. 101-485(II), at 84 (May 15, 1990). Titles I and III's nondiscrimination provision—both of which prohibit discrimination against individuals "on the basis of disability," as opposed to individuals "with a disability"—

each explicitly prohibit discrimination by association.[48]  *See* 42 U.S.C. § 12111(a), (b)(4) (Title I); *id.* § 12182(a), (b)(1)(E) (Title III); *cf. id.* §12132 (Title II).

Yet despite what may be gleamed from congressional records that were not subjected to the rigors of bicameralism and presentment, *see* U.S. Const. art. I, § 7 cl. 1-2, "[w]here the statute is so lucid, we need not look to the legislative history for further guidance." *Phillips v. Marine Concrete Structures, Inc.*, 895 F.2d 1033, 1035 (5th Cir. 1990).  Such appears to be the case with Title II, which provides a "straightforward statutory command" that the Court need only follow. *Gonzales*, 520 U.S. at 6.

Further, even accepting as sound the conclusion that at least some organizations may sue under Title II, the organizations involved as plaintiffs in the relevant cases provided treatment services to individual persons suffering from alcoholism and drug addiction.  *See Innovative Health*, 117 F.3d at 37; *Addiction Specialists*, 411 F.3d at 399; *A Helping Hand*, 515 F.3d at 356; *MX Grp.*, 293 F.3d at 326.  Such individuals may—indeed, some unquestionably do—fall within the

---

[48] Louisiana makes much of the fact that Titles I and III explicitly prohibit associational discrimination, while Title II does not, reasoning that the Court should treat Congress's exclusion of an explicit prohibition on associational discrimination in Title II as an intentional choice.  *See* R. Doc. No. 76-1, at 4-5.  The primary case on which Louisiana relies, *Todd v. Carstarphen*, 236 F. Supp. 3d 1311 (N.D. Ga. 2017), makes the same point.  *See* 236 F. Supp. 3d at 1339-40.

However, Title II does not mirror the structures of Titles I and III.  Whereas Titles I and III include extensive rules of construction to explain the scopes of their general nondiscrimination prohibitions, Title II simply includes a general nondiscrimination prohibition.  This structural distinction between Titles I and II on the one hand, and Title II on the other, is significant and ultimately precludes the inference suggested by Louisiana.  *Cf. Innovative Health*, 117 F.3d at 47 ("Congress surely did not intend to excuse similar discriminatory conduct by a public entity simply because such conduct is spelled out in Title II.").

protective auspices of the ADA. *See* 42 U.S.C. § 12102(1) (defining the term "disability" in the ADA); *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 (2d Cir. 2002) (observing that alcoholism and drug addiction constitute "impairment[s]" under the ADA's definition of "disability"), *superseded by statute on other ground*s, ADA Amendments of 2008, Pub. L. No. 110–325, 122 Stat. 3553; *MX Grp.*, 293 F.3d at 336 (same); *see also* Title II Technical Assistance Manual, The American with Disabilities Act, https://www.ada.gov/taman2.html.

In this case, however, a nondisabled *individual*—Lazaro—is asserting a claim of associational discrimination under Title II. This breed of associational discrimination claim seems materially distinct from such claims asserted by the organizations. After all, the discrimination that these organizations allegedly experienced at the hands of public entities—such as the use of local zoning laws to prevent a methadone clinic from operating within city limits, *MX Grp.*, 293 F.3d at 328—likewise discriminated against a class of Title II-protected disabled individuals by erecting barriers to access to treatment facilities for such individuals "by reason of [their] disability," *see* 42 U.S.C. § 12132.

Thus, blessing these organizations' associational discrimination claims under Title II was a direct means to vindicate the rights of "individual[s] with a disability." *Id.* An individual associational discrimination claim may also vindicate disabled individuals' rights, but the vindication seems more attenuated. Individual claims seem primarily designed to vindicate the interest of the individual asserting it—and as a nondisabled individual, Lazaro's interests seem beyond Title II's concern.

At least one circuit seems to have endorsed the availability under Title II of individual associational discrimination claims of the type brought by Lazaro. In *McCullum v. Orlando Regional Healthcare System, Inc.*, 768 F.3d 1135 (11th Cir. 2014), nondisabled individuals brought associational discrimination claims against two hospitals under both Title II and Title III of the ADA. *See* 768 F.3d at 1140; *see also McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, No. 11-1387, R. Doc. No. 1-2 (M.D. Fla. Aug. 18, 2011) (complaint). The district court dismissed the claims. *See McCullum*, 768 F.3d at 1141; *see also McCullum*, No. 11-1387, R. Doc. No. 24 (M.D. Fla. Nov. 8, 2011) (Presnell, J.) (order).

On appeal, the Eleventh Circuit first opined that "[i]t is widely accepted that under both the [Rehabilitation Act of 1973] and the ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person." *McCullum*, 768 F.3d at 1142. With respect to the ADA, the Eleventh Circuit exclusively supported this proposition with citations to the same Title II cases previously explored by the Court: cases involving organizations that provide services to individuals protected by Title II. *See id.* at 1142 (citing *Innovative Health*, 117 F.3d at 46-48; *Addiction Specialists*, 411 F.3d at 405-09; *A Helping Hand*, 515 F.3d at 362-64; *MX Grp.*, 293 F.3d at 333-35).

The Eleventh Circuit then went on to identify Title III's explicit prohibition on associational discrimination as "[t]he section of the ADA conferring standing on a non-disabled party." *Id.* When interpreting this provision of Title III as to nondisabled individuals, however, the court again referenced cases in which other

circuits recognized organizational standing to sue under Title II. *Id.* (citing *A Helping Hand*, 515 F.3d at 358-59, 363-64; *MX Grp.*, 293 F.3d at 329-31, 333-35).

As far as its analysis of the ADA, then, the Eleventh Circuit in *McCullum* may be off the mark in several respects. First, *McCullum* seems to conflate the ADA's various titles, and in the process does not consider potentially material linguistic and structural differences among them. Likewise, *McCullum*'s use of case law bearing on associational discrimination claims does not distinguish among the ADA's titles, and does not differentiate between organizations versus nondisabled individuals. Based on these shortcomings, the Court declines to follow *McCullum*'s conclusions as to the ADA.

In the end, the text of Title II does not appear to make room for associational discrimination claims. The regulation recognizing such claims, then, looks as if it rests on a fragile foundation.

However, in law—as in life—looks can be deceiving.

### ii.

While Louisiana's argument about the plain meaning of Title II is "strong," what "may seem plain when viewed in isolation" can become "untenable in light of [the statute] as a whole." *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015) (internal quotation marks omitted) (alteration in original). Such is the case here.

That is because "Congress has instructed courts that 'nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V [i.e., § 504] of the Rehabilitation Act . . . or the regulations issued by Federal agencies pursuant to such title.'" *Frame v. City of Arlington*, 657 F.3d 215, 223-24

(5th Cir. 2011) (en banc) (quoting 42 U.S.C. § 12201(a)) (alterations in original). Thus, "the ADA actually *prohibits* courts from construing Title II to apply a lesser standard than" § 504 and regulations promulgated to implement it. *Id.* at 228 (emphasis added). If § 504 permits individual associational discrimination claims, then Title II must also permit such claims, the plain text of Title II notwithstanding.[49] *Cf. id.* ("Because the Rehabilitation Act regulations require new and altered facilities, including sidewalks, to be accessible in most circumstances, our construction of [Title II] requires no less.").

Currently, § 504's regulations do not address the issue of discrimination by association.[50] The Court will therefore focus only on the statutory text.

Section 504 provides, in relevant part: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). As used here, the phrase "individual with a disability"

---

[49] *Todd v. Carstarphen*, 236 F. Supp. 3d 1311 (N.D. Ga. 2017), on which Louisiana so heavily relies, does not acknowledge—let alone discuss—Congress's instruction vis-à-vis construction of the ADA. *See* 236 F. Supp. 3d at 1338-42.

[50] On January 19, 2017, the Department of Justice proposed a regulation explicitly recognizing the availability of associational discrimination claims under § 504. *See* U.S. Dep't of Justice, Notice of Proposed Rulemaking, Amendment of Regulations Implementing Section 504 of the Rehabilitation Act of 1973—Nondiscrimination Based on Disability in Federally Assisted Programs or Activities (Jan. 19, 2017), https://www.federalregister.gov/documents/2017/01/19/2017-01057/amendment-of-regulations-implementing-section-504-of-the-rehabilitation-act-of. The proposed regulation provides that "[a] recipient shall not exclude or otherwise deny aid, benefits, or services of its program or activity to an individual because of that individual's relationship or association with an individual with a known disability." *Id.* The comment period ended March 20, 2017. *Id.*

encompasses "any individual who has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment," among other things. *Id.* § 705(20)(A)(i). As with Title II's nondiscrimination provision, then, § 504's nondiscrimination provision only proscribes discrimination against "individual[s] with a disability." *Id.* § 794(a); *cf.* 42 U.S.C. § 12132.

Yet when it comes to its enforcement provision, § 504's language appears notably broader than Title II's. Whereas Title II extends its "remedies, procedures, and rights" to "any person alleging discrimination on the basis of disability in violation of [Title II's nondiscrimination provision]," 42 U.S.C. § 12133, § 504 makes its "remedies, procedures, and rights . . . available to any person *aggrieved* by *any act or failure to act* by any recipient of Federal assistance or Federal provider of such assistance under [§ 504's nondiscrimination provision]," 29 U.S.C. § 794a(a)(2) (emphasis added).[51]

Thus, § 504's enforcement provision does not limit relief to "qualified individual[s] with a disability"—persons whose treatment by § 504-covered programs and activities can violate § 504's nondiscrimination provision. *Id.* § 794(a). Instead, the enforcement provision extends relief to "any person" who is "aggrieved" by such a violation. *Id.* § 794a(a)(2). Even the narrowest constructions of this language to be endorsed by courts leave non-disabled individuals with room to bring associational discrimination claims in certain circumstances. *See Loeffler v. Staten Island Univ.*

---

[51] "Courts have construed the phrase 'any person aggrieved' as an expression of Congressional intent to accord standing to the fullest extent permitted by the case and controversy provision of Article III." *Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 48 (1st Cir. 2000.

*Hosp.*, 582 F.3d 268, 283-88 (2d Cir. 2009) (Jacobs, C.J., dissenting in part) (interpreting the term "aggrieved" as used in § 504's enforcement provision as coterminous with the types of conduct proscribed by § 504's nondiscrimination provision); *McCullum*, 768 F.3d at 1143-45 (same); *Bernius v. Ochsner Med. Ctr. – North Shore*, L.L.C., No. 16-14730, R. Doc. No. 33, at 8-14 (E.D. La. Dec. 15, 2016) (Barbier, J.) (same); *cf. Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 47-49 (1st Cir. 2000) (concluding that a parent has standing under § 504 to sue in her individual capacity for retaliation that she experienced while assisting her disabled child vindicate his rights under federal law).

As the Court previously discussed, § 504 sets a floor on the scope of protection afforded by Title II. *See Frame*, 657 F.3d at 228 (explaining 42 U.S.C. § 12201(a)). Given the fact that § 504 is sufficiently broad to permit at least some category of individual associational discrimination claims, Title II must be read to permit the same. As to the parameters of such Title II claims, however, the text of Title II is silent.

### iii.

*Chevron* instructs courts that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 843; *see also Frame*, 657 F.3d at 224-25 ("When confronted with a statutory ambiguity, [courts] refer to the responsible agency's reasonable interpretation of that statute."). In this case, the Attorney General promulgated a regulation providing that "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or

entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."  28 C.F.R. § 35:130(g).

The Court concludes that the Attorney General's interpretation of Title II, as embodied in the relevant regulation, is reasonable.  *See Frame*, 657 F.3d at 224-25. The conduct proscribed by the regulation hews to the conduct proscribed by Title II's nondiscrimination provision itself.  *Compare* 42 U.S.C. § 12132, *with* 28 C.F.R. § 35:130(g).  This approach simply adapts the structure of Title I and III's associational discrimination claims to the Title II context.  *Compare* 42 U.S.C. § 12112(b)(4) (Title I), *and id.* § 12182(b)(1)(E) (Title III), *with* 28 C.F.R. § 35:130(g) (Title II).

Such an approach is perfectly sensible.  Indeed, if the Attorney General considered nontextual evidence when developing the regulation, such as Title II's legislative history—evidence that executive agencies may have greater flexibility to access and evaluate than the federal courts—then the choice to craft a Title II associational discrimination regulation that is consistent with Titles I and III's analogous proscriptions becomes more sensible still.[52]  The Court concludes that the regulation challenged by Louisiana is lawful and represents an authoritative construction of Title II.

v.

One final note: "[a] Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so

---

[52] *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. at 35706 (explaining the scope of 28 C.F.R. § 35:130(g) in part by reference to the legislative process leading up to Title II's enactment).

enforced as well." *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001). A regulation, "if valid and reasonable, authoritatively construe[s] the statute itself." *Id.*

"[T]here is no question" that Title II, like § 504, is enforceable via an implied private right of action. *Frame*, 657 F.3d at 224. There is also no question, then, that nondisabled individuals like Lazaro have a private right to enforce the valid and reasonable—and thus authoritative—Title II regulation proscribing associational discrimination by public entities.

## C.

However, Lazaro must not merely show that associational discrimination claims are available under Title II. He must in fact *state* such a claim. The same goes for analogous claims under § 504.

### i.

The relevant Title II regulation provides that "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35:130(g). Thus, in order to state a Title II associational discrimination claim, a plaintiff *must* allege, in part, that he in fact suffered discrimination as defined in the regulation: either exclusion from or denial of equal services, programs, or activities by a public entity.

Lazaro alleges that he was "'subjected to discrimination' by [Louisiana] when [Louisiana's agents] forced him into the untenable role of attempting to interpret for his son information which if misunderstood could (and did) result in his son's loss of

liberty."[53]   However, this allegation involves *Nelson's* potential exclusion from or denial of equal services, programs, or activities by Louisiana—*not* Lazaro's.

This is not a case, for example, in which a public entity "refuse[s] to allow a theater company to use a school auditorium on the grounds that the company had recently performed for an audience of individuals with HIV disease" or "refuses admission to a person with cerebral palsy and his or her companions." Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35694, 35706 (July 26, 1991) (explaining the type of conduct proscribed by 28 C.F.R. § 35:130(g)).   Instead, this is a case in which a public entity did not provide an ASL interpreter to a deaf individual, and a non-deaf individual may have suffered a derivative harm as a result.   Such a harm, however, is not enough.   *Cf. United States v. Nobel Learning Communities, Inc.*, No. 09-1818, 2010 WL 1047730, at *4 (E.D. Pa. Mar. 24, 2010) (McLaughlin, J.) (concluding that Title III associational discrimination claims require allegations that a plaintiff "experienced direct discrimination because of his or her association with a disabled person" and that allegations "premised on a derivative benefit or harm based on treatment towards a disabled person" are insufficient).   Louisiana's use of Lazaro's sign language skills to communicate with Nelson simply did not exclude Lazaro from equal services, programs, or activities, or deny him the same.

Lazaro has not alleged that Louisiana discriminated against him within the meaning of the applicable Title II regulation.   Consequently, Lazaro has failed to state a Title II associational discrimination claim against Louisiana.

---

[53] R. Doc. No. 78, at 10; *see also* R. Doc. No. 69, ¶¶ 63-65.

In addition to Title II, Lazaro also asserts an associational discrimination claim under § 504. Two circuits have thus far considered what standard governs the types of injuries required in order to state such a claim. They have reached different results.

The Second Circuit was the first circuit out of the gate. In *Loeffler v. Staten Island University Hospital*, 582 F.3d 268 (2d Cir. 2009), two nondisabled plaintiffs alleged that "they were compelled to provide sign language interpretation [to their deaf father] for the [defendant] Hospital and were consequently taken out of school and exposed to their father's suffering." 582 F.3d at 279-80 (Wesley, J., concurring with Sand, J.).

Two judges on the three-judge *Loeffler* panel concluded that these allegations were sufficient, holding that "non-disabled parties bringing associational discrimination claims [under § 504] need only prove an independent injury causally related to the denial of federally required services to the disabled persons with whom the non-disabled plaintiffs are associated." *Id.* at 279. In reaching this result, the panel concluded that § 504's enforcement provision "is distinct from the [§ 504] provision prohibiting discriminatory conduct on the part of the recipient of federal assistance." *Id.* at 280 (discussing the relationship between 29 U.S.C. §§ 794(a) and 794a(a)(2)). Thus, in the panel's view, the types of injuries cognizable under § 504's enforcement provision need not be limited to exclusion from participation in, denial of the benefits of, or subjection to discrimination under a covered program or

activity—the types of conduct prohibited under § 504's nondiscrimination provision. *Id.*; *see also* 29 U.S.C. § 794(a).

The third judge on the panel, then-Chief Judge Jacobs, dissented from this portion of the panel opinion, contending that the panel's holding was inconsistent with both applicable precedent and statutory text, as well as principles of judicial prudence. *See id.* at 283-88 (Jacobs, C.J., dissenting in part). In particular, Chief Judge Jacobs took issue with the panel's refusal to interpret § 504's enforcement provision in light of its nondiscrimination provision. *See id.* at 284-87. To Chief Judge Jacobs, courts had generally recognized associational discrimination claims under § 504 only where nondisabled plaintiffs "were aggrieved *in the same manner* and *for the same reasons* as an 'otherwise qualified individual with a disability' under [§ 504's nondiscrimination provision]: they were 'excluded from the participation in, [ ] denied the benefits of, or [ ] subjected to discrimination under any program or activity receiving Federal financial assistance.'" *Id.* at 285 (quoting 29 U.S.C. § 794(a)) (emphasis and alterations in original). He then looked to the ADA's treatment of associational discrimination claims, observing that "[w]hen Congress enacted the ADA, it [ ] clarified the standing requirement that associated persons be themselves actually excluded or denied, and thereby unambiguously limited the breadth of 'any person aggrieved.'" *Id.* at 286.

To Chief Judge Jacobs, the non-deaf plaintiffs in *Loeffler* "were never excluded from participation, denied services, or subjected to discrimination." *Id.* at 285. Rather, "[t]hey assisted their parents in coping with an alleged violation of [§ 504] without themselves being denied services." *Id.* While "[t]hey may well have been

31

injured, forced to interpret for their parents, and made to miss school (among other injuries)," Chief Judge Jacobs concluded that § 504 "does not confer standing on account of these types of injuries." *Id.*

Chief Judge Jacobs also challenged the panel's holding as nothing less than illogical. In his view, the panel's "wide interpretation of 'any person aggrieved' [in § 504's enforcement provision] has no evident limiting principle, as can be illustrated in the hospital context." *Id.* at 287. He explained:

> Relatives and friends of patients routinely provide additional or complementary services to patients. Once a breach of duty is found under [§ 504], everybody and his mother (literally) will be able to submit a bill for services and injuries. A friend lifts a wheelchair up a few stairs when there is no ramp, and is injured; a relative prepares a gluten-free meal that a hospital lacks resources to provide, and thereby incurs expense, or gets burned on the stove; a sister stays up all night to cheer the patient and translate from Dutch as needed, and suffers the trauma of a flatlining.
>
> If [§ 504] supported all these claims flowing from an initial act of discrimination, a hospital's liability would never end. And the hospital might have to pay twice or many times over for each service it failed to afford. If this were the law, [§ 504] would in that respect grant more extensive remedies to associated persons than to persons with disabilities themselves: only the disabled would actually have to be excluded, denied, or subjected to discrimination in order to recover damages.

*Id.* at 287. Lastly, Chief Judge Jacobs expressed concern that the panel's broad understanding of cognizable injuries would inevitably "create intractable administrative problems for judges and juries." *Id.*

Although Chief Judge Jacobs' view did not carry the day in *Loeffler*, it later persuaded the Eleventh Circuit in *McCullum*. *See* 768 F.3d at 1143-45. As in *Loeffler*, *McCullum* involved hospitals relying on non-deaf plaintiffs to help communicate with a deaf family member. *See id.* at 1138. Tracking Chief Judge

Jacobs' argument, the *McCullum* Court was of the opinion that § 504's enforcement provision should be interpreted in light of § 504's nondiscrimination provision. *Id.* at 1144. Section 504's nondiscrimination provision only proscribes exclusion from participation in, denial of the benefits of, or subjection to discrimination under a covered program or activity. 29 U.S.C. § 794(a). Based on this enumeration, the *McCullum* Court was convinced that a person is "aggrieved" under § 504's enforcement provision only where he experiences *these* types of conduct—nothing more, nothing less. 768 F.3d at 1144. The *McCullum* Court then concluded that non-deaf individuals are not "denied benefits when a hospital relies on them to help interpret for a deaf patient."[54] *Id.*

Faced with this circuit split, another section of this Court sided with Chief Judge Jacobs and the Eleventh Circuit. *See Bernius v. Ochsner Med. Ctr. – North Shore*, L.L.C., No. 16-14730, R. Doc. No. 33, at 8-14 (E.D. La. Dec. 15, 2016) (Barbier, J.). Notably, Judge Barbier pointed out that "[r]equiring personal exclusion, denial of benefits, or personal discrimination"—in other words, requiring the types of injuries enumerated in § 504's nondiscrimination provision—"is consistent with the ADA's instruction that 'nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under' Section 504." *Id.* at 13 (quoting 42 U.S.C. § 12201(a)).

---

[54] In reaching this conclusion with respect to § 504, the *McCullum* Court pointed to Title II regulations that entitled disabled individuals "to appropriate benefits in the form of accommodation," but that "did not confer any corresponding benefit on non-disabled persons." *Id.* (citing 28 C.F.R. § 35.160(b)(1)).

After considering the statutory text and relevant case law, the Court likewise endorses Chief Judge Jacobs's interpretation of § 504. To walk the path forged by the *Loeffler* panel "would result in the application of different standards for the ADA and [§ 504]. *Id.* at 13-14. Indeed, that path would seem to result in the application of more restrictive associational discrimination standards under the ADA's titles than under § 504. *Compare* 42 U.S.C. § 12112(b)(4) (Title I), 28 C.F.R. § 35:130(g) (Title II), 42 U.S.C. § 12182(b)(1)(E) (Title III), *with Loeffler*, 582 F.3d at 279-80 (§ 504). This is precisely the outcome forbidden by Congress. *See* 42 U.S.C. § 12201(a).

As the Court previously indicated, Lazaro's injury is that he was required to interpret between his son and his son's probation officer.[55] Such an injury is not cognizable under § 504.[56] *See McCullum*, 768 F.3d at 1145; *Bernius*, R. Doc. No. 33,

---

[55] *See* R. Doc. No. 78, at 10; *see also* R. Doc. No. 69, ¶¶ 63-65.

[56] Lazaro argues that he qualifies as a "person aggrieved" under § 504's enforcement provision, because Louisiana allegedly violated two relevant regulations. *See* R. Doc. No. 78, at 10. The first—28 C.F.R. § 35.160(c)(1)—provides that "[a] public entity shall not require an individual with a disability to bring another individual to interpret for him or her." Relatedly, 28 C.F.R. § 35.160(c)(2) provides that "[a] public entity shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication except" in certain enumerated situations.

These regulations were promulgated by the Attorney General to implement Title II. *See* 28 C.F.R. § 35.101(a) (stating that the purpose of Part 35 is to implement Title II's nondiscrimination and enforcement provisions). They do nothing to alter the standard—articulated in another regulation—governing Title II associational discrimination claims: "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." *Id.* § 35:130(g). As the Court previously explained, Lazaro does not meet this standard.

The Court also points out that the two regulations identified by Lazaro ultimately aim to protect individuals with disabilities, not nondisabled individuals. *See id.* §§35.160(c)(1)-(3). Such a focus makes sense: after all, the purposes of the ADA are "to provide a clear and comprehensive national mandate for the elimination of discrimination against *individuals with disabilities*"; "to provide clear, strong, consistent, enforceable standards addressing discrimination against *individuals with*

at 14. Therefore, Lazaro has failed to state a § 504 associational discrimination claim against Louisiana.

V.

Having determined "which aspects of [Louisiana's] alleged conduct violated Title II" for purposes of the *Georgia* analysis—namely, the decision by Nelson's probation officer not to secure a qualified ASL interpreter to attend her meetings with Nelson—the Court must next consider "to what extent such misconduct also violated the Fourteenth Amendment." *Hale*, 642 F.3d at 498 (quoting *Georgia*, 546 U.S. at 159) (internal quotation marks omitted). If this conduct violated both Title II and the Fourteenth Amendment, then Congress's abrogation of Louisiana's sovereign immunity is unambiguously valid in this case. *Id.* As the Court previously stated, if Louisiana's alleged conduct violated only Title II, then the question of the abrogation's validity becomes more complicated. *See id.*

A.

Section 1 of the Fourteenth Amendment provides, in relevant part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

---

*disabilities*"; "to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of *individuals with disabilities*"; and "to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by *people with disabilities*." 42 U.S.C. § 12101(b)(1)-(4) (emphasis added).

As understood by the Supreme Court, this constitutional edict does not oblige states "to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (analyzing *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985)). However, if state action towards the disabled "impermissibly interferes with the exercise of a fundamental right," then the action must withstand strict scrutiny—not merely rational basis review. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976); *see also A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 226 (5th Cir. 2009) (same).

As a threshold matter, plaintiffs appear to argue Nelson's probation officer encroached on Nelson's fundamental rights by not procuring a qualified interpreter for her meetings with Nelson. According to plaintiffs, Louisiana's conduct "greatly impinged upon" Nelson's "conditional liberty interest protected by the Constitution," because the lack of a qualified interpreter at Nelson's meetings with his probation officer "required [Nelson] to guess and hope that he [was] not violating a term of his probation that he did not fully understand."[57]

The Court does not question that due process protections "extend[ ] to probation revocation proceedings" and that "[f]air warning of conduct that may result in revocation is an integral part of due process in such situations." *United States v. Gallo*, 20 F.3d 7, 11 (1st Cir. 1994) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973); *United States v. Simmons*, 812 F.2d 561, 565 (9th Cir. 1987)). Thus, Louisiana has a constitutional obligation to reasonably instruct its probationers as to the

---

[57] R. Doc. No. 86, at 6.

conditions of their probation, and a failure to satisfy this obligation surely may "impermissibly interfere[ ] with the exercise of a fundamental right." *Murgia*, 427 U.S. at 312.

Accepting the factual allegations in the complaint as true and construing them in the light most favorable to plaintiffs, Louisiana fulfilled its obligation to Nelson. Plaintiffs allege that Lazaro—Nelson's father and a non-deaf individual—attended the meeting between Nelson and his probation officer in which the officer explained the terms and conditions of Nelson's probation.[58] Plaintiffs also allege that Lazaro interpreted between Nelson and his probation officer at the meeting.[59]

Although plaintiffs allege that Nelson and Lazaro both repeatedly requested the presence of a qualified interpreter at this meeting, this allegation alone does not demonstrate that the probation officer's reliance on Lazaro's interpretive services at the meeting in any way amounted to impermissible interference with Nelson's due process right to fair warning of his probation conditions.[60] After all, no constitutional rule bars a deaf individual's relatives from providing interpretive services even in criminal trials. *See United States v. Ball*, 988 F.2d 7 (5th Cir. 1993) (per curiam) (noting that "[t]here is . . . no absolute bar against appointing a witness' relative to act as an interpreter [in a criminal proceeding] when circumstances warrant such an appointment").

If Nelson and Lazaro did not feel comfortable with Lazaro acting as an interpreter, then Lazaro simply could have refused to so act, at which point Nelson's

---

[58] R. Doc. No. 69, ¶¶ 32-34.
[59] *Id.* ¶ 34.
[60] *Id.*

probation officer would have had to procure an alternative means to facilitate effective communication between herself and Nelson[61]  Indeed, at a later meeting between Nelson and his probation officer, Lazaro allegedly *did* refuse to interpret. Then, the probation officer indicated that she *would* in fact secure the presence of a qualified interpreter at a rescheduled meeting.[62]  Yet Lazaro then agreed to serve as an interpreter.[63]

Further, plaintiffs allege that Nelson's probation was revoked in one instance. According to plaintiffs, Nelson enrolled in an in-patient drug treatment program in California.[64]  Judge Mentz "found that Nelson had committed a technical violation of the conditions of his probation by leaving the state of Louisiana and ordered Nelson to serve 90 days in the JPCC."[65]

Plaintiffs allege that Nelson "was not aware that leaving [Louisiana] to attend drug treatment as ordered by [Judge Mentz] was a violation of his probation," because Louisiana never provided a qualified interpreter "to explain the terms and conditions of [p]robation to [Nelson] and [Lazaro] in American Sign Language."[66]  Yet in their

---

[61] At one meeting attended only by Nelson and his probation officer, the probation officer allegedly attempted to use written English to communicate with Nelson. *Id.* ¶ 52.  When this method of communication proved unsuccessful, Nelson ended the meeting.  *Id.*  Nelson's probation officer then attempted to secure a qualified interpreter for their next meeting.  *Id.* ¶ 52.  When she was unable to do so, she proposed using the courtroom interpreter at Nelson's next court appearance, which involved an offense unrelated to his probation.  *Id.*  The Court sees no basis to conclude that the probation officer's use of a courtroom interpreter "impermissibly interfere[d]" with any of Nelson's fundamental rights. *Murgia*, 427 U.S. at 312.

[62] R. Doc. No. 69, ¶ 57.

[63] *Id.*

[64] *Id.* ¶ 35.

[65] *Id.* ¶ 39.

[66] *Id.* ¶ 38.

briefing, plaintiffs go out of their way to explain that they "have never argued that Nelson's incarceration as a result of the technical violation [of his probation]"—namely, leaving Louisiana—"was due to a denial of due process."[67]  Plaintiffs also concede that "Nelson knowingly and voluntarily pleaded guilty to the technical violation of probation with adequate assistance of counsel and an interpreter in the courtroom."[68]  If plaintiffs concede that "Nelson's incarceration . . . was not due to a denial of due process" and that he pleaded guilty "knowingly and voluntarily," then despite the allegations in the complaint, plaintiffs appear to concede that Nelson received "[f]air warning of conduct that may result in revocation" in satisfaction of due process.  *Gallo*, 20 F.3d at 11.

Moreover, plaintiffs' allegations suggest that Nelson did not seek guidance from his probation officer or any other Louisiana officer prior to leaving Louisiana to enroll in a California-based in-patient drug treatment program.[69]  Such an oversight on Nelson's part may preclude plaintiffs from arguing now that Nelson did not receive fair warning that leaving Louisiana to receive drug treatment would violate his probation conditions.  *Cf. United States v. Detraz*, No. 99-30722, 2000 WL 959576, at *1 (5th Cir. 2000) (per curiam) ("The Detrazes' failure to seek court or probation office guidance as to the permissibility of the hunting bars their claim to fair notice.  No one misled the Detrazes into going hunting; they simply decided to take their chances.  The clear terms of the conditions of probation barred *any* hunting.").

---

[67] R. Doc. No. 86, at 13.
[68] *Id.*
[69] R. Doc. No. 69, ¶¶ 36-37.

Lastly, Lazaro—Nelson's father and a non-deaf individual—assisted Nelson in securing enrollment in the in-patient drug treatment program in California.[70] Lazaro participated in the meetings between Nelson and Nelson's probation officer.[71] Indeed, he interpreted for Nelson and the probation officer.[72] Thus, Lazaro was privy to the terms and conditions of Nelson's probation, and the lack of a qualified interpreter was not a barrier to his understanding of those terms and conditions. Any misunderstanding about those terms and conditions, then—at least as far as they concerned restrictions on leaving Louisiana—seem unrelated to the absence of a qualified interpreter at Nelson's meetings with his probation officer.

In short, the Court sees no basis to conclude that Louisiana's alleged conduct "impermissibly interfere[d] with the exercise of a fundamental right" by Nelson. *Murgia*, 427 U.S. at 312. The Court will therefore apply rational basis review to its examination of Louisiana's relevant conduct in this case.

## B.

Under rational basis review, a state's conduct does not violate the Fourteenth Amendment if it is "rationally related to a legitimate state interest." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). Further, when challenging state action that is subject only to rational basis review, "the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Garrett*, 531 U.S. at 367 (quoting *Heller v. Doe*, 509 U.S. 312,

---

[70] *Id.* ¶ 35.
[71] *See id.* ¶¶ 33-34.
[72] *Id.* ¶ 34.

320 (1993)) (internal quotation marks omitted).  Plaintiffs have not satisfied that burden.[73]

For example, Louisiana has a legitimate governmental interest in conserving its financial resources.  *Cf. Garrett*, 531 U.S. at 372 (observing that "it would be entirely rational (and therefore constitutional) for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities").  Moreover, Nelson's probation officer's refusal to provide a qualified interpreter to attend her meetings with Nelson, where an alternative means to facilitate effective communication between herself and Nelson was readily available—namely, Lazaro's interpretive services—is rationally related to promoting that interest.

If the probation officer's alleged conduct "impermissibly interfere[d] with the exercise of [Nelson's] fundamental right[s]," *Murgia*, 427 U.S. at 312, then "ordinary considerations of cost and convenience alone" could not justify such conduct, *Lane*, 541 U.S. at 533-34.  However, as the Court previously explained, the conduct at issue in this case does not cross the threshold into impermissible interference.

Louisiana's approach to Nelson's needs may seem "hardheaded[ ]" or even "hardhearted[ ]."  *Garrett*, 531 U.S. at 367-68.  Nevertheless, it does not amount to a violation of the Fourteenth Amendment.

## VI.

The probation officer's alleged conduct toward Nelson therefore violated Title II for purposes of the *Georgia* analysis, but did not violate the Fourteenth

---

[73] In fact, plaintiffs appear to mistakenly assume that Louisiana bears the burden of articulating a rational basis for its conduct.  *See* R. Doc. No. 86, at 7 ("The State has not even offered a rational basis for the unequal treatment of deaf probationers.").

Amendment. *Hale*, 642 F.3d at 498 (quoting *Georgia*, 546 U.S. at 159). As such, the Court must consider one final question: "whether Congress's purported abrogation of sovereign immunity as to [this] class of conduct is nevertheless valid." *Id.* (quoting *Georgia*, 546 U.S. at 159) (internal quotation marks omitted).

## A.

Section 5 of the Fourteenth Amendment grants Congress the power "to enforce, by appropriate legislation, the provisions of" the amendment. In *Katzenbach v. Morgan*, 384 U.S. 641 (1966), the Supreme Court linked the scope of this constitutional language to Chief Justice Marshall's classic formulation of the scope of Congress's Necessary and Proper Power in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819): "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." 384 U.S. at 650-51 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 421 (interpreting U.S. Const. art. I, § 8, cl. 18) and applying it to § 5) (internal quotation marks omitted). Through the lens of *McCulloch*, the *Morgan* Court viewed § 5 as "a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Id.* at 651.

Three decades later, however, the Supreme Court revised the metes and bounds of congressional authority under § 5 in *City of Boerne v. Flores*, 521 U.S. 507 (1997):

> The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of

the Fourteenth Amendment's restrictions on the States. . . . Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."

While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. *There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.*

521 U.S. at 519-20 (emphasis added) (internal citation omitted) (alterations in original).

Worded differently, *Boerne* directs that "[t]he appropriateness of remedial measures must be considered in light of the evil presented." *Id.* at 530. What may be appropriate prophylactic legislation under § 5 with respect to one class of state conduct may be wholly unwarranted with respect to another. *Id.*

Thus, *Boerne*'s "congruence and proportionality" test—as applied to Title I of the ADA in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001)—consists of three prongs. The first prong directs a court to "identify with some precision the scope of the constitutional right at issue" in a given case, as defined by relevant case law. *Garrett*, 531 U.S. at 365. Then, "hav[ing] determined the metes and bounds of the constitutional right in question," the second prong involves considering whether Congress documented "a history and pattern" of unconstitutional action impinging on that right. *Id.* at 368. For the third prong, the court must determine whether Congress's means to prevent or remedy state

incursions on the right is appropriate—*i.e.*, congruent and proportional—based on Congress's documentation. *See id.* at 372-74.

## B.

Less than a decade after introducing *Boerne*'s "congruence and proportionality" test into its Fourteenth Amendment jurisprudence, the Supreme Court applied the test to Title II in *Tennessee v. Lane*, 541 U.S. 509 (2004). In *Lane*, two "paraplegics who use wheelchairs for mobility" brought Title II claims against Tennessee, alleging that it "denied [them] access to, and the services of, the state court system by reason of their disabilities." 541 U.S. at 513. Tennessee argued that Congress had not validly abrogated state sovereign immunity under Title II. *Id.* at 514. The *Lane* Court disagreed, concluding that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 533-34.

According to *Lane*, "[t]he first step of the *Boerne* inquiry [is to] identify the constitutional right or rights that Congress sought to enforce when it enacted Title II." *Id.* at 522. The *Lane* Court concluded that Congress enacted Title II to enforce the constitutional prohibition on irrational disability discrimination, as well as "to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." *Id.* "These rights include some, like the right of access to the courts at issue in [*Lane*], that are protected by the Due Process Clause of the Fourteenth Amendment."

Second, *Lane* considered the "historical experience" reflected by Title II. *Id.* at 523. The *Lane* Court determined that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Id.* at 524. This backdrop was illustrated in part by federal and state case law, which "demonstrate[d] a pattern of unconstitutional treatment in the administration of justice." *Id.* at 525. Further, "[t]his pattern of disability discrimination persisted despite several federal and state legislative efforts to address it." *Id.* at 526.

The *Lane* Court went on to observe that, "[w]ith respect to the particular services at issue in [*Lane*], Congress learned that many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities." *Id.* at 527. Important for present purposes, the *Lane* Court accepted as relevant the "numerous examples" of such exclusion documented by Congress's Task Force on the Rights and Empowerment of Americans with Disabilities, including examples showing a "failure of state and local governments to provide interpretive services for the hearing impaired." *Id.* (citing Task Force on the Rights and Empowerment of Americans with Disabilities, From ADA to Empowerment (Oct. 12, 1990)).

Ultimately, *Lane* accepted Congress's finding, "set forth in the text of the ADA itself," that "discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and *access to public services*." *Id.* at 529 (quoting 42 U.S.C. 12101(a)(3))

(internal quotation marks omitted) (emphasis in original) (alteration removed). "This finding, together with the extensive record of disability discrimination that underlies it, makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Id.*

Third and finally, *Lane* asked "whether Title II is an appropriate response to this history and pattern of unequal treatment . . . as it applies to the class of cases implicating the accessibility of judicial services." *Id.* at 530-31. The *Lane* Court answered this query in the affirmative:

> Congress' chosen remedy for the pattern of exclusion and discrimination described above, Title II's requirement of program accessibility, is congruent and proportional to its object of enforcing the right of access to the courts. The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination. Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this "difficult and intractable proble[m]' warranted 'added prophylactic measures in response."

*Id.* at 531 (quoting *Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 737 (2003)) (alteration in original).

## C.

Post-*Lane*, circuits have split as to how *Lane* impacts the case-by-case application of the *Boerne* test in the Title II context. Some circuits have read *Lane* to streamline the relevant analysis under *Boerne*'s first two prongs, leaving only the question whether Title II exhibits congruence and proportionality as it applies to the class of cases implicating the particular right at issue in a given case. *See Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 486-90 (4th Cir. 2005) (Shedd, J.); *Klingler v. Director, Dep't of Revenue, State of Missouri*, 455 F.3d 888,

896-97 (8th Cir. 2006) (Arnold, J.); *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957-59 (11th Cir. 2005) (Kravitch, J.); *see also McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 423-26 (5th Cir. 2004) (Garza, J., concurring in part and dissenting in part). This interpretation of *Lane* still involves a determination as to whether the right at issue was one that Congress sought to enforce when it enacted Title II. *See, e.g.*, *Constantine*, 411 F.3d at 486-87. What it does not involve, however, is an extensive inquiry into Title II's legislative record in every case involving the validity of Title II's abrogation. *See, e.g.*, *id.* at 487.

Other circuits have read *Lane* more narrowly. These circuits have continued to require courts to proceed through each step of the *Boerne* inquiry where Congress's purported abrogation of State sovereign immunity under Title II is at issue, including a deep dive into Title II's legislative record. *See Toledo v. Sanchez*, 454 F.3d 24, 34-35 (1st Cir. 2006) (observing that "[s]ome appellate courts have chosen to interpret . . . *Lane* as conclusively establishing that Title II survives the first two steps of the *City of Boerne* inquiry," but determining that "the sounder approach is to focus the entire *City of Boerne* test on the particular category of state conduct at issue."); *Guttman v. Khalsa*, 669 F.3d 1101, 1117-18 (10th Cir. 2012) (Tymkovich, J.) (same).

Both of these views find support in *Lane*'s language. *See Lane,* 541 U.S. at 522-34. For its part, however, the Court concludes that the former view—which most circuits to have considered the issue have adopted—offers the more sound reading of *Lane*. This reading appears to best respect *Lane*'s comprehensive analysis of Title II's constitutional concerns and supporting history. Moreover, it appears to best

reconcile that analysis with its instruction to conduct a case-by-case inquiry into Title II's validity as § 5 legislation.

Thus, a court tasked with determining whether Title II validly abrogates state sovereign immunity in a given case must first ask whether the state's action in the case implicates a constitutional right within the universe of rights identified by the *Lane* Court—namely, rights grounded in the Fourteenth Amendment's Equal Protection and Due Process Clauses. *See id.* at 522-23 (determining that Title II "seeks to enforce th[e] prohibition on irrational disability discrimination" and "other basic constitutional guarantees, infringements of which are subject to more searching judicial review"). If no, then Title II does not validly abrogate state sovereign immunity. If yes, then "the sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services" supports Congress's enactment of Title II as prophylactic legislation to enforce that right. *Id.* at 528-29. A court then need only ask whether Title II is congruent and proportional as to the class of cases implicating the right.

### D.

First, like the constitutional right implicated in *Lane*, the constitutional right implicated by Nelson's probation officer's conduct in this case is grounded in due process: the right to "[f]air warning of conduct that may result in revocation" of probation, which "is an integral part of due process in such situations." *Gallo*, 20

F.3d at 11. This due process right is within the universe of rights identified by the *Lane* Court.[74] *See Lane*, 541 U.S. at 522-23.

The Court must now consider whether Title II is congruent and proportional as it applies to the class of cases implicating the due process right to fair notice of probation conditions. *Lane* held that "Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services." *Id.* at 531. While *Lane* itself concerned physical access to the courts, the Court sees no reason why that holding is not equally applicable in this case. A state has a due process obligation to provide a probationer with fair warning of probation conditions, and a state's failure to provide adequate interpretive services to deaf probationers runs a real danger of breaching that obligation.[75]

As the *Lane* Court opined, "[t]he unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination." *Id.* at 531. Congress was thus justified in prescribing a strong medicine to treat the problem. *Id.*

---

[74] Thus, the Court need not dive into the history of discrimination undergirding Title II. The *Lane* Court already concluded that "inadequate provision of public services [to] and access to public facilities [by individuals with disabilities] was an appropriate subject for prophylactic legislation." *Lane*, 541 U.S. at 529.

That being said, the Court points out *Lane*'s observation that Congress's appointed task force to research disability discrimination across America documented a "failure of state and local governments to provide interpretive services for the hearing impaired." *Id.* at 527. Such a failure undoubtedly has significant implications for deaf probationers' due process rights, including the right to reasonable notice of probation conditions.

[75] Louisiana wholly overlooks the applicability of *Lane*'s holding to this case. *See* R. Doc. No. 85, at 5-8.

While strong, however, this medicine does not mandate that a state provide deaf individuals with any *particular* interpretive service in a given instance. "Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities." *Id.* at 531-32. Rather, Title II requires "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services." 42 U.S.C. §12131(2).

With respect to auxiliary aids and services, Title II's implementing regulations require public entities to "give primary consideration to the requests of individuals with disabilities." 28 C.F.R. § 35.160(b)(2). However, public entities need not honor those requests in all instances. Rather, the regulations recognize that "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." *Id.* Public entities have flexibility in how they fulfill their Title II obligations.[76]

As far as this case is concerned, then, Title II is "a reasonable prophylactic measure, reasonably targeted to a legitimate end." *Id.* at 533. It exhibits the requisite congruence and proportionality in the class of cases implicating the right to

---

[76] Louisiana complains that "plaintiffs' claims [ ] fail because there is a lack of proportionality and congruence between the alleged wrong and the proposed remedy." *Id.* at 6. The problem with Louisiana's argument is that it focuses on *plaintiffs'* proposed remedy, *not* Congress's. *See id.* at 6-8. In other words, what plaintiffs believe should have been done, and what Title II requires to be done, are not necessarily identical. The Court's inquiry into the validity of Title II's application against a state in a given case focuses on the latter, not the former.

fair warning of probation conditions. Louisiana's alleged failure to live up to Title II will not shield it from plaintiffs' Title II claim on behalf of Nelson.

**VII.**

Surfacing at long last from the jurisprudential deep, the contours of this case become clear. For the foregoing reasons,

**IT IS ORDERED** that Louisiana's motion for judgment on the pleadings is **GRANTED**, and all of Lazaro's claims against Louisiana are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Louisiana's motion to dismiss plaintiffs' Title II claims for lack of subject matter jurisdiction is **DENIED**.

New Orleans, Louisiana, November 21, 2017.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**
